UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ALEJANDRO ESPINOZA,                                    CASE NO.

      Plaintiff,

vs.

GAMESTOP, INC., a Foreign Profit Corporation
D/B/A GAMESTOP

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff, ALEJANDRO ESPINOZA, through undersigned counsel, sues Defendant, GAMESTOP, INC., a foreign profit corporation d/b/a GAMESTOP (hereinafter referred to as "GAMESTOP"), for declaratory and injunctive relief, and damages, and alleges as follows:

This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

1)     This action is also brought pursuant to 28 C.F.R. Part 36.

2)     This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

3)     Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

4)     Plaintiff is sui juris, and he is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5)     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

1

6)      Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase a 2024-25 panini Prizm NBA basketball blaster box.

7)      Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer.  The computer is Plaintiff's personal property, and a claim for trespass attached to same.

8)      The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

9)      The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

10)      Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

11)      Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

12)      At all relevant times, Plaintiff is and was visually impaired and has Leber Congenital Amaurosis since birth that substantially impairs Plaintiff's vision whereby his vision fluctuates from 20/250 to 20/800.

13)      Plaintiff's visual impairment interferes with his day-to-day activities and causes limitations in visualizing his environment.  As such, Plaintiff is a member of a protected class under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

14)      In addition, Plaintiff is an advocate of the rights of similarly situated disabled persons. As such is a "tester" for the purposes of asserting his civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated

websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

15)     Plaintiff is limited in the performance of major life activities due to his visual disability and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

16)     Plaintiff uses the computer regularly, but due to his visual disability, Plaintiff cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. In order to assist him, Plaintiff uses NVDA screen reader software that is readily available commercially. As background, screen reader software translates the visual internet into an auditory equivalent.  The software reads the content of a webpage to the user at a rapid pace.

17)     "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." *Andrews v. Blick Art Materials, LLC, 17-CV-767, 2017 WL 6542466, at \*6-7 (E.D.N.Y. Dec. 21, 2017)*.

3

18)     Plaintiff frequently accesses the internet. Because he is significantly and permanently visually disabled, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

19)     Defendant, GAMESTOP, is a foreign profit corporation authorized to do business and doing business in the State of Florida.

20)     Defendant, GAMESTOP, is a company that sells toys, games, collectibles, video games, PC, gaming accessories, electronics, clothing, and consoles. There is a retail location in Miami-Dade County.

21)     At all times material hereto, Defendant was and still is a private entity which owns and operates retail locations under the brand name "GAMESTOP".  The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, restaurant, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

22)     Because Defendant is a store open to the public, each of Defendant's physical stores is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(B), and its implementing regulations, 28 C.F.R. Part 36.

23)     At all times material hereto, Defendant was and still is an organization owning and operating the website located at https://www.gamestop.com/. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, the Defendant has subjected itself and the associated website it created and maintains to the

4

requirements of the ADA. The website also services Defendant's physical stores by providing information on its brand and other information that Defendant is interested in communicating to its customers about its physical locations.

24)     Since the website allows the public the ability to view the products available at Defendant's locations, purchase products, through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, the website is an extension of, and gateway to, Defendant's physical stores which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). By this nexus between Defendant's retail store locations and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's stores for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar stores that must comply with all requirements of the ADA.  The Website must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical stores, which are places of public accommodations subject to the requirements of the ADA.

25)     Plaintiff sought to, seeks to and intends to patronize, in the near future once the Website's access barriers are removed or remedied, one or more of Defendant's physical retail locations, check store hours and product pricing and place online orders. In the alternative, Plaintiff intends to monitor the Website in the near future as a tester to ascertain whether it has been remedied and updated to interact properly with screen reader software.

26)     Traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience, thus the opportunity to shop and pre-

shop Defendant's products, plan his visits, and to compare products, services, prices, sales, discounts, and promotions are important and necessary accommodations for Plaintiff because Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

27)     During the month of July 2025, Plaintiff attempted on a number of occasions to utilize the Website to browse through the merchandise and online offers to educate himself as to the merchandise, sales, discounts, and promotions being offered, learn about the brick-and-mortar location, check store hours, and check product pricing with the intent to make a purchase through the Website or in one of the physical locations and with the intent to make a purchase through the website or at one of Defendant's physical stores.  Plaintiff also attempted to access and utilize the Website in his capacity as a tester to determine whether it was accessible to blind and visually disabled persons such as himself who use screen reader software to access and navigate company websites.

28)     Plaintiff utilized NVDA ("Screen Reader Software") that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. Plaintiff attempted to purchase 2024-25 panini Prizm NBA basketball blaster box on Defendant's website.  However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

29)     Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These barriers are pervasive and include, but are not limited to:

**GameStop**  https://www.gamestop.com/

System settings while doing the review:

Operating system: Windows 11

Browser: Firefox 140.0.2 (64-bit)

Screen Reader: NVDA v. 2025.1.2.36913

Video Recorder: OBS Studio 31.0.4

Number of Barriers Identified: 10

**Summary of Barriers**

GameStop.com claims to prioritize accessibility and even recommends using Firefox with NVDA for the best experience. However, our assessment, conducted using precisely those tools (NVDA v2025.1.2 with Firefox 140.0.2 on Windows 11), reveals that core navigation structures are fundamentally broken for keyboard and screen reader users. The header and sitewide menu system consistently trap users in illogical focus loops, making basic navigation a confusing and frustrating task. Upon activating the mobile menu or navigating through the top-level categories, focus frequently jumps to unrelated areas of the page, or worse, to hidden content that remains in the tab order. Users are often forced to re-tab through collapsed mobile menus even when they are visually closed. This results in repetitive, disorienting journeys that break the expected sequence and render large parts of the interface unpredictable and unusable.

These issues are compounded by the lack of a skip link or any other bypass mechanism, forcing users to relive this broken navigation structure every time they load a new page. Submenu items under main categories like "Video Games" and "Consoles & Hardware" are not announced by screen readers, and often open or persist inconsistently without clear user interaction. In some cases, submenus like "Favorite Fandoms" appear unexpectedly, without any title or announcement, diverting users into a new region without warning or context. Even when titles are present, the items within are silent, leaving screen reader users unaware of what is in focus or whether they're in the correct menu at all.

Crucial informational elements, like the selected store name and store hours, are visible on screen but not conveyed programmatically. Users relying on screen readers only hear "Change My Store," losing vital context that sighted users receive immediately. Similarly, the homepage carousel—a key promotional space—fails to convey any text or image descriptions, denying screen reader users access to current deals, themes, or featured products.

Despite the site's use of accessibility overlays and monitoring tools, these barriers demonstrate that real-world usage diverges dramatically from claimed conformance. The accessibility features promoted in GameStop's statement fail to deliver meaningful support when tested under their own recommended conditions. As a result, users with disabilities are left with a fragmented, confusing, and incomplete shopping experience.

**Violation 1: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

Description: When the user lands on the homepage and activates the menu button (header-mobile-menu col-3), the menu visually expands and appears ready for interaction. However, as the user begins navigating with a keyboard, focus unexpectedly skips out of the expanded menu and jumps to unrelated top-level header elements — including the Search bar, Trade-In, GameStop Pro, Sign In, and Cart. Only after passing through these unrelated items does the focus return to the expanded menu.  This breaks the logical navigation sequence expected in modal or menu interactions.  Real-world Impact: Screen reader and keyboard-only users expect to stay within a menu once it is opened. This disruption disorients them, adds unnecessary steps, and increases cognitive load. It may also cause users to miss menu content entirely or abandon navigation due to perceived malfunction.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ETmE_qqk_45Ak2XjQcYpyW4B8jhSrAIXCb iY4mmkCtRAoA


**Violation 2: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description: When the user navigates through the expanded menu, they reach a region labeled as the store link (<div class="store-header" id="menuStoreHeader" ...>). Although the interface visually displays the selected store name ("Sawgrass Mills Mall") and its hours ("Open until 9:00 PM"), the screen reader only announces "Change My Store."  The actual store name and hours are not conveyed through accessible text or programmatically associated with the interactive element. This critical contextual information is visually present but completely lost to users relying on assistive technology.  Real-world Impact: Screen reader users cannot determine which store is currently selected. This leads to confusion about location-specific features such as pickup options, stock availability, or store hours. It also creates a disparity in access compared to sighted users who can see this information at a glance.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EbHiFkGc1Q9Er-Wm2WC777wBj88MRnUdobFoUmyYjUGXRQ


**Violation 3: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Description: When navigating the menu, the user can expand categories such as "Video Games." Upon expansion, the screen reader correctly announces the menu title ("Video Games") along with additional metadata, such as "chevron right 3 of 14," indicating position and control. This label appears to be sourced from the aria-label or title attribute used for toggles. However, as the user moves into the subcategory list (e.g., "Xbox One," "PlayStation," etc.), none of these submenu items are read aloud by the screen reader. Additionally, they do not receive visible focus indicators. The subcategories seem to be rendered in a <ul class="dropdown-menu"> structure, but individual <li> or <a> elements lack accessible names or roles that make them perceivable to assistive technologies. Real-world Impact: Keyboard-only and screen reader users cannot explore submenu options under main categories like "Video Games." This limits their ability to browse by platform or category and forces them to rely on full-page navigation instead of the intended menu structure. It creates a frustrating and unequal shopping experience.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EZNWGMdqJopOhzlPBhIfhIUBsVxndzUHG xzzqBroDY3dDw

**Violation 5: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Barrier Description: When the user navigates the "Video Games" main menu item and expands it, focus proceeds through the submenu, but the screen reader does not announce the individual submenu items such as "Xbox One" or "PlayStation." When the user reaches the end of this list and continues tabbing, the screen reader unexpectedly announces the next main menu item, "Consoles & Hardware," even though the submenu visually remains focused on "Video Games."  This barrier fails to meet WCAG 1.3.1 (Info and Relationships). It prevents screen reader users from understanding what items are in focus or knowing that the submenu has ended, leading to confusion about what content is being interacted with. Real-world impact: a blind user would not know which links they're navigating or selecting within a submenu, increasing the likelihood of unintentional navigation and impeding product discovery.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EfqMKvj88rNMmzahxWfUUNcB6Qw1ErBT FHqaDreY5rFKMA


**Violation 6: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Barrier Description: As the user continues navigating the header menu with the keyboard, a submenu visually expands that matches the layout and content of the "Favorite

Fandoms" section. However, this expanded submenu is not announced by the screen reader and contains no visible title to indicate what section has opened. While navigating, the screen reader does not read out any of the submenu items, making it unclear where focus has landed.  Despite the visible content corresponding to "Favorite Fandoms," the URLs displayed in the bottom left corner of Firefox (as recommended by GameStop's own accessibility page) reveal that focus is actually moving through the "Consoles & Hardware" submenu in the background. This confirms that visual display and programmatic focus are not aligned, and no assistive feedback is provided.  This violates WCAG 1.3.1 (Info and Relationships). It prevents screen reader users from knowing that a new section has opened, offers no heading or context, and completely omits announcing the submenu items. Real-world impact: Users relying on screen readers will not realize that navigation has shifted into a different section. They are left unaware of what links are being focused, which results in confusion, disorientation, and a significant barrier to exploring available product categories.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EXLrqCMylKJCrIt0CJIa9YkBJFn3v7UVZ7G IpMGIhGw0HA

**Violation 6: 2.1.1 Keyboard**

All functionality of the content is operable through a keyboard interface without requiring specific timings for individual keystrokes, except where the underlying function requires input that depends on the path of the user's movement and not just the endpoints.

Barrier Description: When the user navigates through the top menu using the keyboard and tries to move past the "Video Games" main menu item into "Consoles & Hardware," the submenu for "Favorite Fandoms" opens instead. This occurs even when the user never interacted with that section. Sometimes the "Favorite Fandoms" heading is shown; other times (like after pressing ESC to close "Video Games"), the same submenu appears without a title.  This violates WCAG 2.1.1 (Keyboard) because the user cannot rely on standard keyboard navigation to move logically through the main navigation. Focus shifts unexpectedly, and keyboard-only users are not able to access the next menu item in sequence.  Real-world impact: Keyboard users, including those relying on screen readers, become trapped or redirected into an unrelated submenu. This disrupts orientation, makes exploration unpredictable, and impairs their ability to navigate the main menu fully or efficiently.

Applicable WCAG 2.1 Standard at Issue: 2.1.1 Keyboard (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/Ebft_b4lXL9OlAuM1s3bROUB-5MrVGjvSv5qOUu6krxlGg

**Violation 7: 2.4.1 Bypass Blocks**

A mechanism is available to bypass blocks of content that are repeated on multiple Web pages

Barrier Description: Neither the Home nor Deals page, and likely no other page across the site, offers a skip link or any other mechanism to bypass the persistent header section. This section includes the main menu, which is already inaccessible and forces users to navigate through redundant or malfunctioning submenu content multiple times on every page load.  This violates WCAG 2.4.1 (Bypass Blocks), which requires a mechanism to skip repetitive content. Without such a mechanism, users must manually tab through the same broken navigation structures every time they load a new page.  Real-world impact: Keyboard and screen reader users are forced to re-navigate an inaccessible menu on every page, significantly increasing cognitive load and interaction time. This leads to frustration and may prevent them from reaching the main content altogether, especially if they get lost in repeated navigation traps.

Applicable WCAG 2.1 Standard at Issue: 2.4.1 Bypass Blocks (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/deals

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EVwH5S9TzcNAovn29ly8-jgBxmrdHlrlMIugz0uhVJ0DQg

**Violation 8: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

Description: After the user navigates past the "Cart" link in the header, focus unexpectedly shifts into the hidden mobile menu region. Although the menu is visually collapsed, its contents remain focusable and are included in the accessibility tree. As a result, the user is forced to tab through all the mobile menu items before reaching the next visible content such as "Trading Cards" or "Deals."  Real-world Impact: This breaks logical focus sequence and traps users in a hidden region, especially harming those relying on screen readers or keyboard navigation. It can be confusing, time-consuming, and disorienting, making it harder to efficiently explore or interact with the site content.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/ESRQjuBSSQFPvKDRvBpMlDMBxFcBU1xI rVAExp8CSVR0CA


**Violation 9: 2.4.3 Focus Order**

If a Web page can be navigated sequentially and the navigation sequences affect meaning or operation, focusable components receive focus in an order that preserves meaning and operability.

Description: After the user navigates past the "GS Pro Credit Card" link in the header, instead of moving forward to the next item ("Track Order" in the <ul id="subnav">), focus is incorrectly redirected back into the hidden mobile menu. This menu is not visibly open, but all its items remain in the focus order and must be tabbed through again before the user can reach the next visible interactive elements.  Real-world Impact: This creates a repetitive and disorienting keyboard experience. Users relying on keyboard navigation or screen readers are forced to re-navigate the same hidden content multiple times. This behavior breaks logical focus flow, increases cognitive load, and makes the site more difficult to use, especially for users with disabilities.

Applicable WCAG 2.1 Standard at Issue: 2.4.3 Focus Order (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EXfG3lS7DoJPq_jvqrElxtMBj0ZQhLB2_mv7x65FxJevtw

**Violation 10: 1.3.1 Info and Relationships**

Information, structure, and relationships conveyed through presentation can be programmatically determined or are available in text.

Barrier Description: The promotional carousel section (class: gme-v3-carousel gme-v3-carousel-hero) fails to convey meaningful content to screen reader users. As the user navigates through the banners, key information such as the promotional text ("Pre-Owned, Phone Home! Explore the best pre-owned deals in the universe") and the visual

content (e.g., images of trading cards or controllers) are not announced. The screen reader does not detect or communicate this content, leaving users unaware of the context, theme, or value of these high-profile marketing elements.  Real-World Impact: Blind or visually impaired users relying on screen readers miss out on essential promotional offers and content. They cannot perceive current sales, featured products, or brand messaging, creating an unequal experience and excluding them from making informed shopping decisions.

Applicable WCAG 2.1 Standard at Issue: 1.3.1 Info and Relationships (Level A)

URL Where Issue Was Encountered:

https://www.gamestop.com/

Screen Capture Evidence:

https://askbizit.sharepoint.com/:v:/s/ADA/EamFoScYGrZFoJX7ZMyuYmcBMhsvYQ3B
AjOKhUlYewgjIg

30)     Although the Website appeared to have an "accessibility" statement displayed and an "accessibility" widget/plugin added, the "accessibility" statement and widget/plugin, when tested, still could not be effectively accessed by, and continued to be a barrier to, blind and visually disabled persons, including Plaintiff as a completely blind person. Plaintiff, although he attempted to access the statement, thus, was unable to receive any meaningful or prompt assistance through the "accessibility" statement and the widget/plugin to enable him to quickly, fully, and effectively navigate the Website.

31)     The fact that Plaintiff could not communicate with or within the Website left him feeling excluded, as he is unable to participate in the same shopping experience, with the same access to

the merchandise, sales, discounts, and promotions, as provided at the Website and in the physical locations as the non-visually disabled public.

32)     Plaintiff desires and intends, in the near future once the Website's access barriers are removed or remedied, to patronize one or more of Defendant's physical stores and to use the Website, but he is presently unable to do so as he is unable to effectively communicate with Defendant, due to his severe visual disability and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to effectively access, navigate, and communicate with Defendant through the Website due to his severe visual disability and the Website's access barriers. Thus, Plaintiff, as well as others who are blind and with visual disabilities, will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

33)     On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

34)     On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of Website by individuals with disabilities.

35)     On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

36)     On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

37)     On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

38)     On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

39)     On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

40)     Defendant has not created and instituted an effective Specialized Customer Assistance line or service or email contact mode for customer assistance for the visually disabled.

41)     Defendant has not created and instituted on the Website a useful or accessible page for individuals with disabilities, nor displayed a link and information hotline, nor created an information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled or blind community.

42)     The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

43)     Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of purchasing Defendant's products offered on the Website and in the physical stores from their homes.

44)     Defendant thus has not provided full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and their physical stores in contravention of the ADA.

45)     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

46)     The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet shopping websites such as the Website at issue in the instant action.

47)     Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website which prevent individuals with visual disabilities from the means to comprehend information presented therein.

48)     Defendant is, and at all relevant times has been, aware of the need to provide full access to all visitors to the Website.

49)     The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

50)     Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with its website access and operation.

51)     Notice to Defendant is not required because of Defendant's failure to cure the violations.

52)     Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

53)     Plaintiff has retained the undersigned attorneys to represent him in this case and has agreed to pay them a reasonable fee for their services.

**COUNT I – VIOLATION OF THE ADA**

54)     Plaintiff realleges paragraphs 1 through 53 as if set forth fully herein.

55)     Pursuant to 42 U.S.C. §12181(7)(B), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

56)     Pursuant to 42 U.S.C. §12181(7)(B), the Website is covered under the ADA because it provides the general public with the ability to view the products available at Defendant's locations, purchase products through Defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand. The Website thus is an extension of, gateway to, and intangible service, privilege, and advantage of Defendant's physical locations. Further, the Website also serves to augment Defendant's physical stores by providing the public information about the stores and by educating the public as to Defendant's brand and available products merchandise sold through the Website and in the physical stores.

57)     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

58)     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

59)     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to

22

ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

60)     The Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

61)     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has made available to the public on the Website and in their physical stores in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

62)     The Website was subsequently visited by Plaintiff's expert in July and the expert determination was that the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff. Also, when the Website was visited by the expert, although the Website appeared to have an "accessibility" statement and widget/plugin linked on and displayed from its home page, the "accessibility" statement and widget/plugin, when tested, still could not be effectively used or accessed by, and continued to be a barrier to, blind and visually disabled persons such as Plaintiff. Defendant furthermore has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website an effective and useful "accessibility" notice, statement, or policy to provide blind and visually disabled person such as Plaintiff with a viable

alternative means to access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302. The lack of a viable and effective "accessibility" notice, policy, or statement and the numerous access barriers as set forth in the Declaration of Plaintiff's expert, Mario Saavedra, attached hereto and the contents of which are incorporated herein by reference, continue to render the Website not fully accessible to users who are blind and visually disabled, including Plaintiff.

63)     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

64)     There are readily available, well-established guidelines on the internet for making Websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

65)     Defendant has violated the ADA -- and continue to violate the ADA -- by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Website are ongoing.

66)     The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

67)     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems".   Indeed, 28 C.F.R.§36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

68)     According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

69)     Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

70)     As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication, and thus violates the ADA.

71)     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to their brick-and-mortar stores, Plaintiff has suffered an injury in fact by being denied full access to, enjoyment of, and communication with Defendant's Website and its physical stores.

72)     Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

73)     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

    i.     Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a functional statement as to the Defendant's policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations through the Website and the physical locations.

    ii.     Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period prior to the Website's being made readily accessible, provide an effective alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

    iii.     Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's stores and becoming informed of and purchasing Defendant's products, and during that time period prior to the Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical stores.

    iv.     Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned

counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

74)     WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

a.      A declaration that Defendant's website is in violation of the ADA;

b.      An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

c.      An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

d.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

---

[1] 

e.      An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

f.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

g.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

h.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

i.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

j.      An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and

shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

k.      An award to Plaintiff of his reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.

## COUNT II – TRESPASS

Plaintiff realleges paragraphs 1 through 53 as if set forth herein.

75)     Defendant's website contains software analytics.  Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

76)     Plaintiff never consented to and was unaware that Defendant's website was placing software on his computer.

77)     The "pop-up" or banner notice that appears on Defendant's website does not properly audibilize the cookies policy in a way where a visually disabled person like the Plaintiff can properly understand or give informed consent to allow tracking cookies to be placed on his computer.

78)     Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on his personal computer, which was done without his knowledge and consent.

79)     Defendant's trespass has damaged Plaintiff by affecting the condition and value of his computer.

80)     On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

Cookies and Similar Technologies

We and our third-party partners use cookies and similar technologies (e.g., web beacons, pixels, ad tags and device identifiers) to recognize you and/or your device(s) on, off and across different Services and devices. This helps us to provide you with the best possible experience when you browse our website and allows us to improve our site.

For detailed information on the cookies and similar technologies we and our third-party partners use, the purposes for which we use them, and how to disable them, see below. You can also visit allaboutcookies.org to learn more about managing cookies and similar technologies.

Expand for more information

Cookies:

We automatically collect information through the use of cookies. Cookies are small text files stored by your Web browser. Cookies allow us to identify and authenticate visitors, track aggregate behavior, and enable important site features (such as storing items placed in your shopping cart between visits). For instance, we or authorized third parties may use cookies to help maintain to help maintain the integrity of video statistics, prevent fraud and to improve the site experience.

We use both session ID cookies and persistent cookies. A session ID cookie expires when you close your browser. We use session cookies to improve your shopping experience as you browse through the site. A persistent cookie remains on your hard drive for an extended period of time. We use persistent cookies to maintain your login information so that your cart and login remain available when you return to the site. We also contract with analytics services and third-party advertising companies to collect similar information for specific purposes. The use of cookies by our partners is not covered by this Privacy Policy.

Web Beacons / Pixels:

Web beacons, also called pixel tags or tracking pixels, are invisible images as small as 1x1 pixel in size that are embedded in web pages and emails, requiring a call (which provides device and visit information) to our servers for the pixel to be rendered in those web pages and emails. We use pixels to learn more about your interactions with email content or web content, such as whether you interacted with ads or posts. Pixels can also enable us and third parties to place cookies on your browser.

Local storage:

Local storage enables a website or application to store information locally on your device(s). Local storage may be used to improve your experience, for example, by enabling features, remembering your preferences, and speeding up site functionality.

Other similar technologies:

We also use other tracking technologies, such as mobile advertising IDs, device fingerprinting, and tags for similar purposes

Advertisements on our websites, applications, products, and services:

Advertisements that appear on our website are sometimes served directly to users by third-party advertisers with whom we have agreements. They may automatically receive your IP address when this happens. These third-party advertisers may also place cookies on your computer or use other technologies such as JavaScript and web beacons to measure the effectiveness of their ads and to personalize advertising content. Doing this allows the advertising network to recognize your device each time they send you an advertisement to measure the effectiveness of their ads and to personalize advertising content. In this way, they may compile information about where individuals using your computer or browser saw their advertisements and determine which advertisements are clicked. Third-Party Advertisers may also serve advertisements to you on other websites, based on their tracking of what content you viewed or interacted with on our Websites, Apps, or other GameStop property. We do not have control over how these third-party advertisers use information from these technologies, nor is that activity governed by this Privacy Policy. For more information about this practice and the choices you have to restrict the information used by these companies, please refer to the 'Your Rights and Choices' section of this privacy policy.

Digital Advertising:

Third-party advertising companies serve ads on our behalf across the Internet. They may collect information about your browsing activities through cookies on other sites, and then display personalized ads on various sites that you visit. Data collected on our websites and applications may be provided to third-party advertising partners, such as LiveRamp (https://liveramp.com/privacy/) or Criteo (https://www.criteo.com/privacy/).

This information may also be provided to their demand partners for interest-based advertising.

Social Media:

Our Sites include social media features, such as the Facebook 'Like' button and widgets, the 'share this' widget, or interactive mini programs that run on our site. These features may collect your IP address, which page you are visiting on our Site, and may set a cookie to enable the feature to function properly. Social media features and widgets are either hosted by a third-party or hosted directly on our Sites. Your interactions with these features are governed by the privacy statement of the company providing it. We may post GameStop information on social media sites. Your comments and other reactions will be visible if you respond.

Analytics:

We also use cookies and similar technologies to gather information about the success of our ad campaigns and use of our products and services. These technologies include Google Analytics, Adobe Analytics, and others.

81) Due to Plaintiff's disability, he could not understand Defendant's website and he could not give informed consent to Defendant's installation of data and information tracking software on his computer. Defendant also could not give informed consent to Defendant's collection of his browsing history and the placement of analytics on his computer.

82) Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from his computer and determine which programs should be installed and operated on his computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email: info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email: radamslaw7@gmail.com
By: _____/s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434